IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:23-CR-102 |
| v. | ) | |
| | ) | JUDGES VARLAN/McCOOK |
| MATTHEW ESTES | ) | |

## UNITED STATES SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney for the Eastern District of Tennessee, hereby files this Sentencing Memorandum in support of its position that a guideline term sentence of seven hundred and twenty (720) months imprisonment should imposed.

### FACTUAL AND PROCEDURAL HISTORY

Every sex crime against a child is horrific. But some crimes bring even the most seasoned law enforcement, attorneys, and probation officers to their knees. This is one of those cases.

On Christmas Eve in 2015, when most children are dreaming of Santa's arrival, a sixteen (16) month old toddler and an eight (8) year old boy were being raped by the defendant. [Presentence Investigation Report (PSR), Doc. 58, ¶¶22-27]. The defendant—who was related to the toddler and a friend of the eight-year-old's family—had been trusted to babysit the children. While the children's parents were out, the defendant videoed himself anally raping the 16-month-old toddler. He also videoed himself performing oral sex on the eight-year-old boy. [*Id.*] The defendant then distributed these videos online.

In February 2016, the defendant raped the toddler again and videoed the rapes again. The February 9th video is five minutes and 12 seconds long. [*Id*. at ¶ 18.] The video begins with a room now identified as the room above the garage where the defendant lived in Knoxville,

Tennessee. [*Id.*] The video depicts the defendant holding the victim in his arms, both nude from the waist down. [*Id.*] The defendant places the victim on his back on a bed and forces his legs apart. [*Id.*] The defendant lays on the victim and forcibly sodomizes the victim, then moves the victim onto his side continuing to forcibly sodomize the victim. [*Id.*] At the four minute, seven second mark, the defendant appears to ejaculate into the anus of the victim. [*Id.*] The defendant then uses a small towel and wipes the victim's anal area before redressing himself in his pajama bottoms, walking over to the iPad, and appears to turn it off. [*Id.*]

The February 10th video is one minute and 19 seconds in length and depicts the defendant sitting down in front of the iPad. [*Id.* at ¶ 20] He is holding the victim around the waist; both are naked from the waist down. [*Id.*] The defendant forces his erect penis into the anus of his victim and the defendant continues to penetrate his victim. [*Id.*] The defendant then holds the victim's legs with his right hand while using his left hand to keep his penis in the victim's anus. [*Id.*] The defendant rolls the victim on his right side and discovers what appears to be blood coming from the victim's anus and uses a small towel to wipe the blood from the victim's anus. [*Id.*] The victim, still screaming and crying, tries to crawl away as the defendant is pulling on his pajama bottoms. [*Id.*] The defendant walks to the iPad and turns it off. [*Id.*]

Again, as with the first set of videos, the defendant distributed the February videos on the internet, where they will stay forever more. [*Id.* at ¶¶ 17, 19]

It was not until May of 2016 that the National Center for Missing and Exploited Children (NCMEC) learned of the December 2015 videos and sent a Cybertip to law enforcement in Knoxville, Tennessee. Investigators discovered that the defendant had produced five (5) videos of himself raping the sixteen (16) month old, and one video and one image of him raping the eight (8) year old boy. According to NCMEC, based on the image/video files names, it was

2

possible the images were taken on December 24, 2015, between 9:30 p.m. and 11:00 p.m. The defendant had also distributed the videos and images online. [*Id.*]

The tip did not, however, contain any information about the child-sexual-abuse videos the defendant made in February of 2016.

The same day the NCMEC tip was received, law enforcement spoke to the defendant's father. The father was shown redacted versions of the sexual-abuse videos and images from December 2015 and identified the defendant. [*Id.* at ¶ 23] The defendant's father also confirmed that the defendant and his mother were vacationing in Oregon, and that the defendant had an iPhone and iPad with him. [*Id.* at ¶ 23] The Federal Bureau of Investigation (FBI) sent agents to secure the defendant's electronics, however the defendant's mother refused to turn them over. [*Id.* at ¶ 23] By the time law enforcement in Knoxville got a warrant to search defendant's iPhone and iPad, both had undergone a factory reset. The reset was shown to have been done the same day FBI agents went to retrieve the electronics. [*Id.* at ¶ 23] That reset deleted from the device any videos, images, and digital forensics they had contained. As a result, neither the iPhone or iPad contained the six (6) videos or the image of child pornography (CP) the defendant had produced and distributed over the internet.

In February of 2017, the Knox County District Attorney's Office charged the defendant for 25 sexual crimes that he had committed in December 2015. [*Id.* at ¶ 26] The defendant was prosecuted as an adult, having waived the right to challenge whether he should be tried as a juvenile. [*Id.*] He pled guilty to four felonies: two counts of Rape of a Child in violation of Tennessee Code Annotated (T.C.A.) § 39-13-522, and two counts of Especially Aggravated Sexual Exploitation of a Minor in violation of TCA § 39-17-1005. [*Id.* at ¶ 27] The defendant was sentenced to thirty (30) years in state prison. [*Id.*]

3

The child pornography that the defendant created and distributed on his two victims for which he was convicted by the state of Tennessee was submitted to NCMEC. NCMEC is used as a clearinghouse for, among other things, assisting law enforcement in identifying victims and defendants in sex crimes against children. Each victim or victims are given a series name depending on if there are multiple victims in the images/videos. The toddler and eight (8) year old victims series images/videos were given the name of "SUPER HERO BOYS 1 & 2" because the toddler had on super hero pajamas prior to being raped in one of the videos. Through NCMEC it is reported that the "SUPER HERO BOYS" series has been distributed around the world for other child predators' revolting sexual pleasure. And because of the NCMEC series, the defendant and his toddler victim were identified in the two additional videos that the defendant had produced and distributed in the instant case. Both were of the defendant raping the toddler approximately six weeks after he committed his Christmas Eve terror. [*Id.* at ¶ 28]

In October 2017, the Royal Canadian Mounted Police contacted Knoxville Police to advise that they had found an additional video of the defendant raping the toddler created on February 9, 2016. [Id. at ¶17] The video was located on a dark-web website called "HurtMeh." The new video was titled, "Toddler being pummeled without any regard to his well-being." [*Id*.] The video had not been identified as part of the "SUPER HERO BOYS" series.

In May 2018, an investigator with the Santa Barbara County District Attorney's Office contacted Knoxville Police with information about yet another video of the defendant raping the toddler. [*Id.* at ¶ 19] The video had not been previously identified as part of the "SUPER HERO BOYS" series, either. The new video contained EXIF data which indicated that the video had been filmed at the defendant's home, had been created by an Apple iPad, and had been created on February 10, 2016. [*Id.*]

4

In October of 2023, the federal grand jury indicted the defendant for two counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), and two counts of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A). [*Id.* at ¶¶ 2-5] On October 2, 2024, the defendant entered into a plea agreement with the United States and pled guilty to Counts One and Two of the Indictment charging Production of Child Pornography. [*Id.* at ¶ 7]

## ANALYSIS

1. *The factors stated in 18 U.S.C. § 3553(a) favor a sentence within the defendant's guideline range.*

The defendant's guideline range is 720 months imprisonment. [*Id.* at ¶101] For the reasons stated below, a within-guidelines sentence would be sufficient, but not greater than necessary, to comply with the following purposes of 18 U.S.C. § 3553(a).

   a. *A within-guidelines sentence is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the defendant.*

A within-guidelines sentence would reflect the seriousness of the defendant's offenses. 18 U.S.C. § 3553(a)(2)(A). "Retribution is a valid penological goal." Glossip v. Gross, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring); see also United States v. Martinez-Barragan, 545 F.3d 894, 898 (10th Cir. 2008) ("[T]he length of the sentence reflects the gravity of the crime."). Here, the seriousness of the defendant's multiple and continued raping and torturing of the toddler weighs in favor of a guideline 720-month sentence of imprisonment. The offenses committed by this defendant, sexually abusing an innocent toddler and then distributing the crime out on to the internet, are some of the most serious. His victims trusted him for care and

5

protection; they received from him horrific sexual abuse that will affect them for the rest of their lives.

Not only did the defendant repeatedly rape his defenseless victims, he videoed the rapes and then distributed the videos online. Years after the production and initial distribution of his CP videos, the videos are still being distributed around the world and watched by other child predators. The defendant committed crimes that don't stop. According to NCMEC, in 2025 alone, one hundred twenty-two (122) defendants have already been caught with at least one of the "SUPER HERO BOYS" videos in their possession. The defendant's victims will never stop being victimized by the defendant. He put them in a lifetime emotional prison.

The defendant committed some of the worst criminal acts imaginable. Then he made the choice to lie to Dr. Adler, a psychologist who interviewed him, by minimizing what he had done to his two victims. [*See* Exhibit 1, J. Michael Adler, Ph.D., "Sex Offender Risk Assessment," pg. 2]. He would like this Court to believe that he was playing a video game one day with the eight (8) year old while speaking online with a man who told him to perform fellatio on the eight (8) year old, and to video it, so he did; but the defendant would not have performed the criminal act unless it satisfied his already present morbid desires. Nor is it reasonable to believe that the eight (8) year old would have allowed the sexual act to be performed unless he was groomed, threatened, or both. His toddler victim was easier prey. Because of his age and inability to understand the magnitude of what was happening, and his inability to communicate the horrendous acts being perpetrated against him, the toddler became the defendant's favored target. If the defendant truly had not wanted to make videos of him aggressively raping the toddler, all he had to do was stop.

6

A within-guidelines sentence would also promote respect for the law. 18 U.S.C. § 3553(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that had generating millions of dollars through the exploitation of children. [S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43]. The Act, which included 18 U.S.C. § 2251, was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. [S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56]. But the Act and its later amendments are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." [S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43]. The defendant has proven multiple times he has no respect for the law, no respect for children or their safety, and certainly no respect for their innocence.

And a within-guidelines sentence would provide just punishment. 18 U.S.C. § 3553(a)(2)(A). Just punishment for the defendant is extremely important. To this defendant, his victims are so unimportant that when interviewed, he indicated he understood his actions were harmful to children, but that he thought the 16-month-old probably would not remember. [Doc. 58 at ¶ 93].

      **b.**    *A within-guidelines sentence is necessary to deter the defendant and others from producing and distributing videos of the sexual abuse of children.*

Section 3553 also guides the Court to consider the need for a sentence that affords adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). From the standpoint of sentencing, deterrence takes two forms: (1) specific deterrence, to deter similar crimes by the

7

defendant who is being sentenced, and (2) general deterrence, to deter criminal actions by others who may contemplate committing similar offenses. The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." Smith v. Doe, 538 U.S. 84, 103 (2003).

A within-guidelines sentence is necessary to deter the defendant. 18 U.S.C. § 3553(a)(2)(B). How many children must a defendant sexually victimize, or how many times must a child be sexually abused, before his attacker is considered a recidivist? The defendant fits well within the class of recidivists. The defendant knows that his raping of vulnerable human beings will not be tolerated. A sentence of 720 months imprisonment will hopefully send a message that each of his victims is important, as are the number of videos he put out on the internet.

A within-guidelines sentence is necessary to deter other sexual predators who prey on children. 18 U.S.C. § 3553(a)(2)(B). In cases involving sexual violence, there is a critical need for general deterrence. A 720-month imprisonment sentence will send a message to would-be sex offenders to think again before committing a crime of sexual violence especially against a child. "There is another aspect of the compounding harm that the production and distribution of child pornography inflicts. It may incite or encourage others to sexually abuse children." *States v. Irey*, 612 F.3d at 1208 (11th Cir. 2010). This is true for the defendant's CP videos. Years after the crime, the videos are still being circulated by child predators and worse the defendant is being revered for the violent rapes he produced and distributed.

General deterrence is especially critical here, considering the intense online interest in the defendant's sexual-abuse videos. While investigating this case, law enforcement found on the dark web a chat room entitled HurtMeh. Under the section entitled "Boys" are labeled topics.

8

One of the topics is labelled ▮▮▮▮▮▮▮▮▮▮▮▮ where one can share videos and conversations. ▮▮▮▮▮▮▮▮ writes: "Such a fucking Idol to me! He got the complete package! Hot, big, violent, big pedo dick, rapes the lil shit of his brother, like a psycho, totally selfish and in control of the helpless slut… Violent homo incest rape at its best! Fuck Yeah!!!" ▮▮▮▮▮▮▮▮: "SOOO fucking true! He is not just a child abuser; he is a sick brutal babyrape GOD!...I can only hope this hero inspires many other pedo sadist men to brutally rape tiny screaming babies hard…" ▮▮▮▮▮▮▮▮ responds: "Couldn't put it better. A perfect stud using his cock in the way it was intended – to pleasure himself by brutally raping some little piece of fuckmeat and, in the process, also giving lots of pleasure to fellow pedos." ▮▮▮▮▮▮▮▮ chimes in saying: "The only tim people post is to hope for more of Matt Estes." ▮▮▮▮▮▮▮▮ review: "This is the best baby raping vid I've seen." ▮▮▮▮▮▮▮▮: "[I]f we want more people out there making these kinds of videos, circulating more videos like this is what drives them to do it." ▮▮▮▮▮▮▮▮: "People do not understand how close some of us are. How desperate some of are to have it." ▮▮▮▮▮▮▮▮: "I'm fucking obsessed with this guy, and want to be him. right up to be him right up to but not including getting caught and going to jail. I really want to put together a Matt Estes fan club, or maybe an Estes Men fan club, to worship them when they get out of jail."

These are like-minded people who idolize the defendant and revere his atrocious acts. The defendant's crimes and his torturing of children make them ravenous for more of these videos, instigates their twisted hunger, and emboldens them to produce their own in an effort to match the level of the defendant's viciousness, or worse, to surpass it. A 720-month sentence is needed to deter Estes's fan club from receiving, distributing, viewing, or producing child-sexual-abuse material.

### c. A within-guidelines sentence is necessary to protect children from further crimes by the defendant.

Our society's children deserve to be protected from the criminal sexual acts performed by this defendant. 18 U.S.C. § 3553(a)(2)(C). The defendant has proven himself to be a repeat offender, producing and distributing multiple videos of the sexual torture he inflicted on his two victims. The defendant was not coerced into making the videos, he enjoyed making them, and enjoyed the accolades he received. As one of his fans said on the dark web "Hurt Meh" website, said: "One of my favorite qualities of this series is Matt's focus on the camera. You can tell the recording is being played on a screen and he's watching from the camera's perspective, and he is really enjoying it. You can tell he was a viewer before a producer."

How and why the defendant got into sexually and physically abusing child victims, that exploded into producing and distributing, only the defendant knows. The defendant's repeated sexual abuse of children shows is that he is a dangerous child predator who will sexually abuse children again if given the chance. A within-guidelines sentence will prevent him from harming more children.

### d. A within-guidelines sentence is necessary to avoid unwarranted sentencing disparities.

A within-guidelines sentence would prevent "unwarranted sentence disparities" between the defendant here and other "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "The point of the guidelines is to decrease sentencing disparities, an objective furthered by a within-guidelines sentence[.]" United States v. Swafford,

639 F.3d 265, 270 (6th Cir. 2011). In contrast, defendant's request for a below-guidelines sentence would be "more likely to create disparities than eliminate them." Id.. The defendant is asking for 18 U.S.C. § 3553(a)(6).

> e. ***The nature and circumstance of the offense, and history and characteristics of the defendant, should be considered in fashioning a sentence.***

The 3553 factors include considering, among other things, the nature and circumstance of the acts, and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).

The nature and circumstances of the defendant's offenses favor a within-guidelines sentence. 18 U.S.C. § 3553(a)(1). Words cannot fully describe the defendant's evil conduct. Sadly, one of the defendant's fans describes the horrific violence that escalated from the five (5) videos uploaded to the internet in December 2015 to the videos produced by the defendant on February 9, 2016, located on the internet in October of 2017 and May of 2018.

▬▬▬▬▬▬▬▬▬ posts on the internet:

> *Our favorite toddler and brother/uncle/daddy (whomever the fuck he is) are back in a never posted before video. The one, there is zero regard for the well-being of the toddler - the forced contortion, the yanking of his legs, the screams (oh yes, many), the fact he's being slammed into with the weight of the dude. Yes, truly a baby fuck like we (at least I) haven't seen on here. Clear view to prove the two things most debated about the last set of videos: definitely this dude fucking the kid and the kids is definitely getting fucked. Enjoy!*

These two videos are outside the heartland of most cases of child production. Once a person views either one of the videos created in February of 2016, for which the defendant is charged, the sound of the toddler's screams and his attempts to crawl away will be locked in your mind forever. But what wakes one in the middle of the night with cold sweats is the defendant

looking straight into the camera while anally raping the child, the child screaming in pain and fear; and the aberrant, apathetic look of pleasure and power in the defendant's eyes.

The distribution of these videos will never stop. The agent who worked this case is the primary point of contact for the "SUPER HERO BOYS" who has gotten thousands of calls from people who work at NCMEC, agents, investigators, and prosecutors, all wanting reassurance that this defendant will never hurt another child. Unfortunately, since NCMEC has identified the series, there have been two thousand five hundred and eighteen (2,518) sex predators who have been arrested for distributing/receiving or possessing at least one of the videos in the "SUPER HERO BOYS" series.

The defendant's history and characteristics also favor a within-guidelines sentence. 18 U.S.C. § 3553(a)(1). The defendant was taken out of the abuse/neglect home life when he was six (6) years old, and he and his brother were adopted by the Estes family. [Doc. 58 at ¶ 80.] According to the defendant, his adoptive parents provided him with a good childhood, and he had a good relationship with his brother. [*Id.*] Prior to his arrest, he graduated with a GPA of 2.87 from Bearden High School. [*Id.*] He had only one conduct issue in high school, wherein he gave an inappropriate hand gesture to a teacher. [*Id.*] From all of his social media accounts, he was flourishing socially and was a proud member of the Bearden High School football team. But things are not always as they seem.

According to the defendant, he began looking at CP when he was nine (9) years of age and figured out how to do so through his Nintendo game. [*Id*. at ¶ 92] From March of 2016 until his CP videos were discovered, the defendant was chatting online with a thirteen (13) year old boy to whom he asked for nude images.

12

Case 3:23-cr-00102-TAV-JEM   Document 66   Filed 04/01/25   Page 12 of 17
PageID #: 282

The defendant has made claims of sexual abuse by his father, but those claims are not supported by DCS reports. [*Id.* at ¶ 81.] The defendant also made reports of sexual abuse by children living with him in foster care; however, when asked by the Presentence Investigation Report writer about his past sexual abuse, he did NOT report abuse at the foster home. [*Id.* at ¶88.] The United States suggests the defendant's reporting to probation and to the authors of the sexual risk assessments be considered with skepticism based on the contradictions found by the PSR writer and his interest in reporting in hopes of a lesser sentence. In any event, past sexual abuse does not in any way justify the multiple vicious rapes that the defendant performed on two children.

Further, although the victim-offender cycle in male abuse is a popular argument to stave off higher sentences, it is not supported by empirical data. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation…" Lambie, Ian et al., "Resiliency in the victim-offender cycle in male sexual abuse" in Sex Abuse: A Journal of Research and Treatment 14(1) (2002) at 43. See also Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in The British Journal of Psychiatry 179 (2001) at 488 (noting that "the data do not provide strong support for a cycle of sexual substantial proportion of male perpetrators"); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in Child Abuse & Neglect 20(3) (1996) at 230 (concluding that "[S]exual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations.").

13

Case 3:23-cr-00102-TAV-JEM   Document 66   Filed 04/01/25   Page 13 of 17
PageID #: 283

Moreover, with respect to studies which have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy." Glasser, M. et al., "Cycle of child sexual abuse: links between being a victim and becoming a perpetrator" in The British Journal of Psychiatry 179 (2001) at 488. See also Hall, R.C.W., "A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues" in Mayo Clinic Proceedings 82(4) (2007) at 464, ("There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused as children themselves. These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."); Haywood, Thomas et al., "Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents" in Child Abuse & Neglect 20(12) (1996) at 1234, ("Studies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child. Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories. . .") (citations omitted); and Briggs, F. and R. Hawkins, "A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders" in Child Abuse & Neglect 20(3) (1996) at 232, ("Perpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children. . . Excuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers).").

Indeed, "when verified by polygraph…the percentage of offenders who experienced sexual victimization in their own lives drops significantly." Hindman, Jan et al., "Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy" in The Sexual Predator (vol. IV) (2010) at 20-5. See also Hindman, Jan et al., "Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders" in Federal Probation 65(3) (2001) at 8.

In preparation for his state sentencing, the defendant paid two therapists to perform a Sex Offender Risk Assessment on him. In particular the defendant met with Ph.D. Adler on three different occasions. [ *See* Exhibit 1 Dr. Adler, Ph.D., "Sex Offender Risk Assessment."] Up to this point, the defendant chose to make no statements to law enforcement about why he committed his crime. When he spoke to Dr. Adler, the defendant reported significant struggles interpersonally and socially with peers. [*Id.* at pg. 2] He stated that he became involved in a chat group through the KiK app. [Doc. 58 at ¶ 32][Exhibit 1, pg. 2] The defendant revealed that he communicated with several of the members of a chat group that focused on sex. [Doc. 58 at ¶ 32] [Exhibit 1, pg. 2] According to the defendant, he videoed himself performing oral sex on the 8-year-old boy because someone in the chat group asked him to do so. [Doc. 58 at ¶ 32] [Exhibit 1, pg. 2] Also according to the defendant, he videoed himself anally penetrating the toddler because the same person from the chat group told him to do so. [Doc. 58 at ¶ 32] [Exhibit 1, pg. 2] The defendant reported being afraid that if he did not do this, the man from the chat group would publish the first video. [Doc. 58 at ¶ 32] [Exhibit 1, pg. 2] The defendant reported he did not want to engage in the offense with the infant however felt coerced by the threat of having the other offense posted online. [Exhibit 1, pg. 2]

The defendant's allegations of coercion are grotesque attempts to minimize his own violent criminal acts. The first time the justification of coercion came out was until almost six

15

months after the first videos/image came to light when speaking to Ph.D. Adler, who was on the defendant's payroll. The defendant minimized his crime to Ph.D. Adler, making it seem as though he made only one video of each victim. The defendant chose not to explain how the "man" who coerced him knew anything about the toddler or why he chose to text with the man. The defendant failed to tell Ph.D. Adler that he had been making videos of his toddler victim for months if not longer. The defendant made no mention that he performed a factory reset of his electronics so that none of the videos could be located. If the electronics had not been wiped, law enforcement could have corroborated the defendant's claims of communication with a man in a KiK sex chat room. But those communications might also have contradicted the defendant's attempts to minimize his horrific conduct.

The defendant made the decision to minimize his crimes and come up with a justification of coercion that makes little sense. To this day it is still not known how long he had been violating the toddler to make his videos, or to whom he was distributing the videos. The defendant's history and characteristics—including his repeated attempts to minimize his conduct—do not favor a below-guidelines sentence.

> There is no doubt this defendant was troubled. But there is also no doubt that this defendant is extremely dangerous, that he pursued child-sexual-abuse as a lifestyle, that his crimes are uniquely horrific, and that he has repeatedly attempted to minimize them. His history and circumstances favor a within-guidelines sentence.

## Conclusion

The Court should sentence the defendant to 720 months of imprisonment followed by a lifetime of supervised release. That sentence is necessary to meet the purposes of the § 3553(a) factors—especially, the seriousness of the offenses, the need to deter people who produce and

distribute sexual-abuse materials, the need to protect the public, and the need to avoid unwarranted sentencing disparities.

        Respectfully submitted,

        FRANCIS M. HAMILTON III
        UNITED STATES ATTORNEY

By:   *s/Jennifer Kolman*
       JENNIFER KOLMAN
       Assistant United States Attorney
       GA Bar #427930
       800 Market Street, Suite 211
       Knoxville, TN 37902
       (865) 545-4167
       *Jennifer.kolman@usdoj.gov*